UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNY L. DAVIS,

               Plaintiff,                     Civil Action No. 11-cv-14094

       v.                            District Judge Gerald E. Rosen
                                       Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 11]**

       Plaintiff Donny L. Davis brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Both parties filed summary judgment motions (Dkts. 10, 11), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

**I. RECOMMENDATION**

       For the reasons set forth below, this Court finds that substantial evidence supports the Administrative Law Judge's conclusions and that the ALJ did not commit reversible legal error. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On December 20, 2007, Plaintiff filed applications for Child's Insurance Benefits (based on his father's wager-earner status), Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") asserting that he became unable to work on April 1, 1997.  (Tr. 19.)   The Commissioner initially denied Plaintiff's disability application on February 15, 2008. (*Id.*)  Plaintiff then filed a request for a hearing, and on March 22, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Elliot Bunce, who considered the case *de novo*.  (Tr. 19-36, 85-109.)  In a June 10, 2010 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 19-36.) Plaintiff appealed the decision to the Social Security Administration's Appeals Council.  (*See* Tr. 4-7.)  On July 26, 2011, the Appeals Council issued an opinion (1) finding that the ALJ erred in addressing Plaintiff's claim for DIB because Plaintiff had not met the insured status, and (2) adopting the findings and the reasoning of the ALJ regarding Plaintiff's claim for Child's Insurance Benefits and SSI.  (Tr. 5.)  Plaintiff filed this suit on September 20, 2011.  (Dkt. 1.)[1]

### B. Background

Plaintiff was 40 years old when he applied for SSI and 43 years old at the time the Appeals Council rendered its decision. (*See* Tr. 5, 19, 187.)  He has a high-school education, but testified he took special education courses. (Tr. 94, 199.)  He has limited work experience as a dishwasher.  (Tr. 201-02.)

---

[1]Before the Court is, apparently, only a challenge to the Appeals Council's SSI determination: Plaintiff has not argued in his Motion for Summary Judgment that there is sufficient evidence of a medically determinable impairment prior to his 22nd birthday (Child's Insurance Benefits) nor has Plaintiff challenged the Appeals Council's conclusion regarding the expiration of his insured status for DIB.  (*See generally*, Pl.'s Mot. Summ. J.)

1.  *Plaintiff's Testimony at the Hearing Before the ALJ*

The March 20, 2010 administrative hearing did not begin smoothly: Plaintiff, despite several requests by the ALJ, did not raise his right hand for the pre-testimony oath, stated he did not know his address by memory and then consulted his identification card, and reported that he was 45 years old when, in fact, he was 42 years old.  (Tr. 89-92.)  The ALJ informed Plaintiff's counsel that there would be a five minute recess for counsel to

> explain to Mr. Davis how important this hearing is to his application
> for disability. The hearing is going to last approximately 30 to 45
> minutes. During that time, I need Mr. Davis to focus and to answer
> questions.  And the reason I'm doing this is, he at first indicated he
> was unable to distinguish between his left hand and his right hand.
> He indicated he did not know his address.  He has misstated his age.
> Now, to be very candid, I do not see medical evidence that would
> suggest limitations of this extremely profound nature.

(Tr. 92.) Counsel suggested that the issue was that Plaintiff "doesn't pay attention very well because of his disability."  (Tr. 90.)

After the recess, Plaintiff provided limited testimony regarding his mental impairments.  He stated that he was in special education as a child (according to his mother) and that he still needs help understanding what he reads.  (Tr. 94, 104.)  He provided that he hears voices "all day" and has hallucinations.  (Tr. 97, 100.)  Plaintiff said that the voices sometimes tell him things.  (Tr. 97, 100.) He also said that sometimes he "want[s] to do something to somebody" and that the voices have also told him to hurt himself.  (Tr. 100.)  He also testified that he remains alone because people "scare" him.  (Tr. 97.)  Plaintiff testified that he was fired from his work for "fighting" and stated that he loses his temper and does not "like nobody arguing at me."  (Tr. 101.)

When asked what he did during the day, Plaintiff responded, "[I] [j]ust go sit at the McDonald's or just walk all day and pick up cans, bottles.  Sometime [*sic*] I go see my uncle." (Tr.

3

97.)  Plaintiff said that he lives every other day with his mother and other days with his sister, cousin, or friend.  (Tr. 94.)  When he goes to his mother's house, he eats, takes a bath, and then leaves.  (Tr. 95.)  He also testified that he had been in jail a "lot of times."  (Tr. 94.)

### 2. Medical Evidence

On February 11, 2008, Dr. Walter Drawl, under the supervision and review of Dr. John Varani, conducted a psychological evaluation of Plaintiff for Michigan's Disability Determination Services ("DDS").  (Tr. 253-59.)[2]  When asked why he could not work, Plaintiff responded, "I can't work . . . because I can't read or do math good enough to get a job."  (Tr. 254.)  Plaintiff told Dr. Drawl that he was homeless, but had living arrangements "with friends."  (Tr. 254.)   Plaintiff reported that he had never been prescribed psychotropic medications and that he interacted with people "OK."  (Tr. 254-55.)  He described his typical day as, "I get up and go walking, see where I'm gonna stay the next night, go there, do a few things, chill out, and sleep."  (Tr. 255.)  Upon exam, Dr. Drawl found that Plaintiff's thought processes were logically connected and that there were no signs of delusions or thought disorder.  (Tr. 256.)  Dr. Drawl also noted,

> Mild symptom magnification was noted throughout the interview; however, it is hypothesized that Mr. Davis felt such was necessary so that his claim would be considered; as he did present with difficulties in achievement abilities and he did not over-embellish when given the opportunity.

(Tr. 256.)  Dr. Drawl gave Plaintiff a "Word Memory Test" to compare Plaintiff with severely brain-injured subjects.  (Tr. 257.)  The computer generated result was,

> This individual has responded in a fashion which is consistent with the pattern obtained by individuals attempting to simulate cognitive

---

[2]The ALJ and the parties refer to this opinion as Dr. Varani's.  Although the distinction is technical, the Court finds it more accurate to refer to the opinion as Dr. Drawl's.

deficits. It is highly unlikely that even an individual who has sustained severe brain damage would perform this poorly in the absence of symptom exaggeration or malingering issues.

(Tr. 257.) Dr. Drawl concluded that Plaintiff had "no major psychopathologies" but may have a learning disorder and diagnosed him with borderline intellectual functioning. (Tr. 258.)[3] He assigned Plaintiff a Global Assessment Functioning ("GAF") score of 60. (*Id.*)[4]

On February 14, 2008, Dr. Leonard Balunas completed a file review – which, based on this Court's review of the administrative record, must have consisted of limited mental-health records – for Michigan's DDS. (Tr. 262-293.) On a Psychiatric Review Technique Form, Dr. Balunas found that Plaintiff had mild limitations in activities of daily living and maintaining social functioning, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation (each of extended duration). (Tr. 277.) On a Mental Residual Functional Capacity form, Dr. Balunas found that Plaintiff was moderately limited in his ability to understand and carry out detailed instructions, maintain concentration for extended periods, and respond appropriately to changes in work setting. (Tr. 262-64.) Plaintiff otherwise had mild limitations. (*Id.*) Dr. Balunas concluded that Plaintiff was "able to perform work-related tasks involving 1 and 2 step instructions

---

[3]The doctors provided "BIF V62.89" which refers to the borderline intellectual functioning classification code in the DSM-IV. American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*") 740 (4th ed., Text Revision 2000). The DSM-IV provides that borderline intellectual functioning corresponds to an IQ in the 71-84 range. *Id.*

[4]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *DSM-IV* at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

with limited need for sustained concentration and only occasional, minor changes in the work setting." (Tr. 265.)

On April 21, 2008, Plaintiff had an "Access Screening" at Genesee County Community Mental Health ("Genesee CMH"). (Tr. 342.) He reported mood swings, anxiety, depression, and racing thoughts. (Tr. 342-43.) The screener's mental status exam revealed that Plaintiff was distracted and had poor concentration. (Tr. 343.) He had no suicidal or homicidal thoughts, however, and his reality testing was within normal limits. (Tr. 343-44.)

On July 30, 2008, Jeff Fulton, a licensed social worker at Catholic Charities, conducted a "Psychological Assessment" of Plaintiff. (Tr. 431.) Plaintiff presented with anger and nightmares, and reported seeing and hearing things. (*Id.*) Fulton's mental status exam found that Plaintiff was depressed and anxious, and that Plaintiff's thought process was intact but his thought content paranoid. (Tr. 432.)

On November 13, 2008, Dr. Spencer Ballard of Catholic Charities performed a psychiatric evaluation. (Tr. 408-12; *see also* Tr. 483-87.) Plaintiff reported anger, auditory and visual hallucinations, paranoid ideation, and persistent insomnia. (Tr. 409.) Dr. Ballard's mental-status exam found that Plaintiff "relate[d] fairly well," had "spontaneous goal directed" mental activity, had a "grossly intact" memory, but had auditory and visual hallucinations. (Tr. 409.) Dr. Ballard diagnosed paranoid schizophrenia with a rule-out diagnosis of psychosis and borderline intellect. (Tr. 410.) He assigned a GAF score of 40 and prescribed medication. (Tr. 411-12.)

On November 17, 2008, Dr. Ballard wrote a brief note on a prescription form providing that Plaintiff was in "psychotic care" and was "totally disabled and unable to make child support payments." (Tr. 398.)

6

On December 18, 2008, Dr. Ballard completed a medication review. (Tr. 422-25.) He provided that Plaintiff had "daytime sedation and fatigue," but that the medications had improved Plaintiff's mood. (Tr. 423.) Dr. Ballard's diagnosis was unchanged, but he provided an improved GAF score of 50. (Tr. 423-24.) Dr. Ballard prescribed additional medication for fatigue. (Tr. 425.)

A few months later, on March 5, 2009, Plaintiff returned to Dr. Ballard for another medication review. (Tr. 417-20.) Dr. Ballard found that Plaintiff's mood was "stable," the prescribed medications were "effective," and that Plaintiff had no side effects from his medications. (Tr. 418.)

On March 11, 2009, Fulton, the Catholic Charities social worker, wrote a "To Whom it May Concern" letter. (Tr. 314.) It states,

> [Mr. Davis] has made major improvements in his Mental Health state. He initially appeared for services for paranoia, hallucinations, anxiety, and depression. He was diagnosed as paranoid schizophrenic and treated with medication and therapy. He is responding well to this process. However, I believe he should be in the Genesee Community Mental Health system as he is SPMI [serious and persistent mental illness?] and fits the criteria for their services. These services could help him find housing, and stability. I have suggested he go to CMH for an assessment to determine if he is eligible for services. I have told him that if he is denied that he can appeal this denial and get another opinion.

(Tr. 314.)

Accordingly, on March 26, 2009, Plaintiff underwent another "Access Screening" at Genesee CMH. (Tr. 331.) The mental-status portion of the screening provides that Plaintiff's consciousness was clouded, and that he was distractible with poor concentration. (Tr. 332.) The "access coordinator," Linda Larned, R.N., noted that Plaintiff was referred to Genesee CMH because his symptoms were too intense for Catholic Charities to manage. (Tr. 341.)

Genesee CMH referred Plaintiff for case management services. (Tr. 323.) On April 6, 2009, social worker Michelle Harris of New Passages Behavioral Health ("New Passages") performed a "Psychological Assessment." (*Id.*) Plaintiff's thought process was intact but his thought content paranoid. (Tr. 325.) He reported having hallucinations "every now and then" and that he sometimes receives commands like "go jump [i.e., attack] him." (*Id.*) Plaintiff was hyper-verbal but able to stay on topic. (Tr. 326.) Harris assigned Plaintiff a GAF score of 60. (Tr. 328.)

On April 7, 2009, Plaintiff returned to Dr. Ballard for a medication review. (Tr. 413-16.) Dr. Ballard merely indicated that there were no changes since the prior review, but assigned Plaintiff a GAF score of 45. (*Id.*)[5]

Two days later, on April 9, 2009, Plaintiff saw Dr. Anjana Bhrany at New Passages for the first time. (Tr. 557.) Plaintiff reported mood swings, seeing and hearing things, and paranoia. (Tr. 558.) Dr. Bhrany conducted a mental-status exam and found that Plaintiff was cooperative, coherent, and had appropriate thoughts. (Tr. 558-59.) Further, she found that Plaintiff's memory was "functional" and that Plaintiff could perform simple calculations. (Tr. 559.) She noted, however, a tendency for mood swings, "mostly angry outbursts," and visual hallucinations. (Tr. 559.) In response to a question about "occupational problems," Dr. Bhrany stated, "unable to work." (Tr. 561.) Dr. Bhrany diagnosed Plaintiff with schizoaffective disorder, assigned a GAF score of 45-50, and provided that Plaintiff should continue on his medications. (Tr. 560, 562.)

On May 7, 2009, Dr. Ballard completed Michigan Department of Health and Human Services forms for Plaintiff. (Tr. 399-401.) He provided that Plaintiff was diagnosed with

---

[5]A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e .g., no friends, unable to keep a job)." *Id.* at 34.

schizophrenia and had a "long history of paranoid delusions[, and] auditory and visual hallucinations." (Tr. 399-400.) He also provided that Plaintiff had a medical need for assistance in taking medications, meal preparation, shopping, laundry, and housework. (Tr. 399.) He also provided that Plaintiff could not work any job. (*Id.*) In terms of daily functioning, Dr. Ballard stated that Plaintiff "stays at home except for appointments." (Tr. 401.) He assigned a GAF score of 45. (Tr. 401.)

On December 30, 2009, Jennifer Kreiner, a nurse practitioner at Genesee CMH completed a medication review. (Tr. 379.) Kreiner prescribed Plaintiff Seroquel XR, a depression and bipolar medication. (Tr. 380.) On or around the same day, Dr. Bhrany provided a diagnosis of schizoaffective disorder, a rule-out diagnosis of anxiety disorder, and assigned Plaintiff a GAF score of 45. (Tr. 382.)

On January 15, 2010, Plaintiff saw Amia Taylor, a therapist or social worker at Genesee CMH. (Tr. 388.) Plaintiff reported, "sometimes I get so angry that I feel like hurting someone." (Tr. 388.) He denied having a plan to hurt anyone, however, and also refused anger management classes at Genesee CMH. (*Id.*)

The next month, on February 3, 2010, Plaintiff returned to Dr. Bhrany. (Tr. 374-78, 621-25.) Plaintiff reported that the Seroquel XR prescribed by Kreiner was not helping and, in fact, made him angrier. (Tr. 375.) Dr. Bhrany discontinued Seroquel and prescribed Plaintiff Depakote. (*Id.*) Depakote is a seizure medication that can also treat "certain conditions that affect thinking, learning, and understanding." AHFS Consumer Medication Information, *Valproic Acid*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (last visited June 7, 2012).

On February 19, 2010, Plaintiff had another session with Taylor. (Tr. 384-85, 391-92.)

9

Plaintiff reported that he was "doing well" and was compliant with his medication.  (Tr. 385.)  He also reported sleeping better.  (*Id.*)  Taylor recommended that Plaintiff go to a homeless shelter but Plaintiff refused; he said that he stays "here and there" and with his sister or mother sometimes. (*Id.*)  Taylor also noted that a therapist at a different agency reported that Plaintiff's "level of functioning is to[o] low for our program, because he need[s] to be able to communicate with me and tell me what his goals are and what he will like to work on."  (Tr. 391.)

In his March 5, 2010 session with Taylor, Plaintiff similarly reported being compliant with his medication and reported no side effects.  (Tr. 393-96.)

On April 6, 2010, Plaintiff underwent a psychiatric assessment at Genesee CMH with licensed social worker Michelle Harris.  (Tr. 597-615, *see also* Tr. 727-45.)  Plaintiff reported experiencing auditory and visual hallucinations as well as paranoid thoughts.  (Tr. 614.)  Plaintiff also stated that he had contemplated suicide with a knife in 2009 but instead called the CMH hotline. (Tr. 614.)  Harris noted that Plaintiff had a "disheveled appearance."  (Tr. 607.)  Further, Plaintiff was agitated throughout the assessment and believed that his medication was not working properly. (Tr. 608.)

In April and July 2010, Plaintiff returned to nurse practitioner Kreiner for medication reviews.  (Tr. 592-96, 533-37.)  Plaintiff had apparently begun taking another medication, Trilafon, and reported that the voices had decreased since taking that medication.  (Tr. 593-94.)  In July 2010, Plaintiff reported that he was relatively stable but still moody at times around large crowds.  (Tr. 535.)  He also provided that he was sleeping well and that the voices were rare.  (*Id.*)

In August 2010, Plaintiff's primary caseholder at Genesee CMH, Kendall Lagarde, completed a "Quarter Review" form.  (Tr. 526-31.)  Plaintiff reported that his mother had his

medications and reminded him to take them because he could not remember on his own. (Tr. 530.) He stated that the voices were still present but less severe. (*Id.*) Plaintiff again reported a short temper and that he did not like people telling him to do something. (*Id.*)

In September 2010, Plaintiff had a counseling or therapy session with another licensed social worker, Christine Samida. (Tr. 663-64.) He presented a drawing with several pictures: Plaintiff eating at McDonald's, a knife with blood, two people fighting, and Plaintiff winning a lot of money and throwing balls. (Tr. 663.) He also reported nightmares of stabbings. (*Id.*)

On October 5, 2010, Plaintiff returned to Kreiner for a medication review and reported hearing voices again. (Tr. 521-25.) Plaintiff did not want to increase his Seroquel prescription because he thought it would make him too drowsy. (Tr. 523.) Kreiner increased his Trilafon prescription and assigned a GAF score of 45. (Tr. 522, 524.)

On October 13, 2010, LaGarde completed another quarterly review. (Tr. 648-53.) Plaintiff provided that his mother was still responsible for his medications. (Tr. 648.) He also reported breaking out in anxious sweats. (*Id.*)

The record contains a number of progress notes by social workers at Genesee CMH from October 2010. On October 19, 2010, Plaintiff reported that the police came to his house regarding back-pay for child support. (Tr. 511.) Plaintiff said this made him very angry and anxious. (*Id.*) A couple days later, Plaintiff told a Genesee CMH social worker that he believed that the police had wrongly threatened him with jail. (Tr. 508.) He also noted that he would get angry if anyone in the waiting room looked at him. (*Id.*) On October 28, 2010, Plaintiff continued to express anger regarding the police visit. (Tr. 504-05.) Plaintiff also said that his mother dispenses his medication, cooks all his meals, does his laundry, all the chores, and schedules his appointments. (Tr. 635-36.)

11

He also said that while his auditory and visual hallucinations continued, they had diminished greatly with medication.  (Tr. 635.)

A November 16, 2010 progress note completed by LaGarde at Genesee CMH provides that Plaintiff reported having fewer nightmares and not drawing lately.  (Tr. 633-34.)  Plaintiff noted that things had been done for him all his life, such as his mother telling him to bathe and his nephew shaving him.  (Tr. 633.)  Plaintiff reported that he did "not care really and I don't feel like doing anything."  (*Id.*)  He agreed to try to be more independent.  (*Id.*)

Kreiner completed medication reviews in December 2010 and March 2011.  (Tr. 577-81; Tr. 572-76; *see also* Tr. 768-72.)  In December 2010, Plaintiff said that his symptoms increased soon after the October 2010 medication review but had since subsided; he provided that he was not feeling as paranoid and did not feel people were present when they were not.  (Tr. 579.)  In March 2011, Plaintiff reported that he continued to experience paranoia, but "it is much better."  (Tr. 574.)  He reported being satisfied with his medication.  (*Id.*)  Plaintiff continued to provide that his sleep was broken, but acknowledged it was "better than before the meds."  (*Id.*)

An April 7, 2011 "Psychological Assessment Review" completed by social worker Lagarde at Genesee CMH provides a summary of Plaintiff's then-current condition,

> Donny [Davis] is living with his mother and is very dependent on her along with other family members.  Donny does not appear to have an understanding of daily living, taking care of personal hygiene nor household chores.  His mother is very sick with cancer at this time. Donny is now receiving therapy from Consumer Services due to Catholic Charities feeling [*sic*] that he is not appropriate for therapy and discharging him.  Donny continues to have symptoms but they have decreased since compliant with medications.

(Tr. 571.)

12

### 3. Vocational Expert's Testimony at the Hearing Before the ALJ

At Plaintiff's administrative hearing, ALJ Bunce asked a vocational expert ("VE") to consider a hypothetical person with functional limitations approximating Plaintiff's limitations. In particular, the ALJ asked the VE to consider

> an individual of the claimant's age, education, and work history, [who] is able to perform work at any exertional level that consists of no more than simple[,] routine[,] repetitious tasks with one or two step instructions. That does not impose what I will call strict production quotas, meaning the requirement to produce a specified number of units of work in a specified period of time. That does not require more than occasional contact with supervisors or coworkers and does not require interaction with the public to perform job duties.

(Tr. 106.) The VE testified that such an individual could work as a dishwasher, laborer, or laundry worker, each with tens-of-thousands of jobs available in the national economy. (Tr. 107-08.)

## C. Framework for Disability Determinations

Under the Social Security Act (the "Act") Supplemental Security Income is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments

that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Appeals Council's Findings

At step one, the Appeals Council found that Plaintiff has not engaged in substantial gainful activity since April 1, 1997 – Plaintiff's alleged onset date. (Tr. 6.) At step two, the Appeals Council found that Plaintiff had the following severe impairments: schizoaffective disorder and anxiety disorder. (*Id.*) Next, the Council concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.*) Between steps three and four, the Appeals Council determined that Plaintiff had the residual functional capacity to perform

work at all exertional levels but has mental limitations which permit him to perform work that is simple, routine, and repetitive in nature and involves only one or two-step instructions. The claimant cannot comply with strict production quotas (a requirement to produce a specified number of units in a specified period of time), can have no

14

> more than occasional contact with co-workers and supervisors, and
> can have no interaction with the public in performing job duties.

(Tr. 6.)  At step four, the Appeals Council found that Plaintiff had no past relevant work.  (Tr. 7.)

At step five, the Council relied on VE testimony in response to the ALJ's hypothetical, and found

that work existed in significant numbers that Plaintiff could perform: dishwasher, construction

laborer, and laundry worker.  (Tr. 7.)

The Appeals Council did not provide an independent rationale for these findings; instead it

relied on the reasons set forth in the ALJ's opinion.  "Because the Appeals Council's decision

incorporates portions of the ALJ's findings and conclusions, both decisions are referenced in the

[below] analysis." *Frazee v. Astrue*, No. 06-14779, 2008 WL 686251, at *9 (E.D. Mich. Mar. 13,

2008) (citing *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000))).

## E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence

in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

15

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

16

## F. Analysis

Although not clearly demarcated in his brief, Plaintiff raises several claims of error. Plaintiff's primary argument is that the ALJ erred in failing to give controlling weight to the opinions of Drs. Ballard and Bhrany and "did not even discuss the weight given to Dr. Bhrany's opinion" as required by the explanatory aspect of the treating-source rule. (Pl.'s Mot. Summ. J. at 1 (citing 20 C.F.R. § 404.1527(d)(2)).) Plaintiff also appears to argue that the ALJ was inconsistent in his treatment of the opinions of the State DDS physicians, Drs. Drawl and Balunas. (Pl.'s Mot. Summ. J. at 2-3.) Plaintiff also makes an argument that the ALJ erroneously discounted his credibility. (*Id.* at 5.) Plaintiff further argues it was error for the ALJ not to consider the favorable decision by a state administrative law judge (in connection with Plaintiff's claim for state-level disability). (*Id.*) Finally, Plaintiff claims that the ALJ erred in failing to consider his obesity. (*Id.* at 6.) The Court addresses these arguments in turn.

> *1. The ALJ Did Not Reversibly Err In Giving Less than Controlling Weight to Dr. Ballard's Opinion or by Failing to Analyze Dr. Bhrany's Medical Records Under the Treating Source Rule*

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p. Where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating

17

physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527.  In addition, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544. The ALJ's explanation "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996).

### (a) Dr. Ballard's Opinion

Plaintiff asserts that the ALJ should have given controlling weight to the forms Dr. Ballard completed for Michigan's Department of Health and Human services on May 7, 2009.  (Pl.'s Mot. Summ. J. at 3.)  There, Dr. Ballard diagnosed Plaintiff with schizophrenia and indicated, by marking checkboxes, that Plaintiff had a medical need for assistance in taking medications, meal preparation, shopping, laundry, and housework.  (Tr. 399.)  He also indicated that Plaintiff could not work any job.  (*Id.*)

The ALJ assigned this opinion "little weight."   While close, the Court finds that this conclusion is supported by substantial evidence and that the ALJ provided the requisite "good reasons" for assigning this weight.   As an initial matter, the Court notes that the ALJ was not required to give  Dr. Ballard's conclusion that Plaintiff could not work any special deference – even if Dr. Ballard was Plaintiff's treating physician. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488 (6th Cir. 2010) ("[W]hen a treating physician submits a medical opinion, the ALJ must either defer to the opinion or provide 'good reason' for refusing to defer to the opinion. . . .  When a treating physician instead submits an opinion on an issue reserved to the Commissioner – such as

18

whether the claimant is 'disabled' or 'unable to work' – the opinion is not entitled to any particular weight."); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ correctly disregarded treating physician's statement that claimant was "100% disabled" because the regulations reserve this determination for the Commissioner, and noting that the regulations further state "that no 'special significance' will be given to opinions of disability, even those made by the treating physician" (quoting 20 C.F.R. § 404.1527(e)(1), (e)(3))).

Second, and more importantly, Dr. Ballard provided almost no explanation to support his checkbox conclusions regarding Plaintiff's inability to work or need for assistance in taking medications, meal preparation, shopping, laundry, and housework. (Tr. 399.) And what limited explanation Dr. Ballard did provide, is, in significant part, unsupported or inconsistent with the record. For instance, Dr. Ballard provided that Plaintiff had a "long history of paranoid delusions" but, as the ALJ noted, Plaintiff did not report such delusions until July 2008. (*See* Tr. 28; *see also* Tr. 256 (finding no signs of delusions or thought disorder), Tr. 343 (symptom list indicating that Plaintiff did not have hallucinations or delusions).) Further, the subsequent evidence of delusions (evidence not before the ALJ but reviewed by the Appeals Council) is mixed – at times Plaintiff reported that they had diminished or were rare. (Tr. 530, 555, 579, 635.) As another example, Dr. Ballard's May 2009 opinion also indicated that, in terms of daily function, which includes the ability to function independently, "Plaintiff stays at home except for appointments." (Tr. 401.) But the ALJ correctly noted that this finding was not consistent with other evidence: at the administrative hearing Plaintiff testified that he goes to McDonald's and walks the streets looking for cans. (Tr. 97.) Plaintiff also told Dr. Drawl, albeit more than a year earlier, that, on a typical day, "I get up and go walking, see where I'm gonna stay the next night, go there, do a few things, chill out, and sleep."

19

(Tr. 255.)  Plaintiff also provided, to multiple social workers, that he lives with his mother sometimes but other times with other family and friends.  (*E.g.*, Tr. 385.)  The ALJ also correctly noted that, in April 2009, Plaintiff told a social worker that he enjoyed playing basketball and working out.  (Tr. 24, 327.)  Each of these facts undermine Dr. Ballard's conclusion that "Plaintiff stays at home except for appointments."  (Tr. 401.)

In sum, while the record would likely support fully crediting Dr. Ballard's May 7, 2009 findings, the question for this Court is whether substantial evidence, more than scintilla but less than preponderance, *see Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007), supports the ALJ's decision to give Dr. Ballard's opinion little weight.  The Court finds that it does.  Further, the ALJ provided an adequate explanation for assigning that weight.

*(b) Dr. Bhrany's "Opinions"*

Plaintiff next argues that the ALJ violated the treating-source rule by failing to give Dr. Bhrany's opinion(s) controlling weight and by failing to discuss her opinion(s).  But it does not appear that Dr. Bhrany gave a treating-source opinion.  Plaintiff saw Dr. Bhrany for the first time in April 2009 where she diagnosed Plaintiff with schizoaffective disorder and assigned him a GAF score of 45-50.  This "opinion" – assuming for the moment that the April 2009 evaluation constitutes a "medical opinion" under the applicable social security regulations – was not authored by a treating source.  *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . .  Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship.").  Even if Dr. Bhrany and Plaintiff subsequently developed the requisite treating-source relationship, the April 2009

20

"opinion" was not entitled to treating-source deference. *See Kornecky*, 167 F. App'x at 506 ("[T]he relevant inquiry is not whether [the examining doctor] might have become a treating physician in the future if [Plaintiff] had visited him again. The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician at the time he rendered his opinion" ); *see also* 20 C.F.R. § 404.1527(d)(2) ("[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations, such as consultative examinations or brief hospitalizations." (emphasis added)).[6]

In addition to the April 2009 evaluation, the record reflects that Dr. Bhrany saw Plaintiff on two other occasions where she reviewed Plaintiff's medications, provided diagnoses and, on one occasion, assigned a GAF score.  (Tr. 374-78, 382.)  But a mere diagnosis does not appear to be a "medical opinion" as that term is used within the applicable regulations.  Rather, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect *judgments about the nature and severity of your impairment(s)*, including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2) (emphasis added); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("20 C.F.R. § 404.1527(a)(2) defines medical opinions as assertions involving judgments *about* a patient's 'symptoms, diagnosis and prognosis.'" (emphasis added)); *Bieschke v.*

---

[6]Moreover, the Court adds that to the extent that Plaintiff relies on Dr. Bhrany's statement "unable to work" it appears that Dr. Bhrany was listing this as a factor contributing to Plaintiff's condition rather than a result of Plaintiff's condition.  (*See* Tr. 561; *see also* Tr. 382 (providing Axis IV diagnoses of "occupational problems" and "economic problems").

*Comm'r of Soc. Sec.*, 1:07-CV-1125, 2009 WL 735077, at *2 (W.D. Mich. Mar. 12, 2009) ("The Magistrate correctly concluded that these statements by Dr. Kornoelje do not constitute a medical 'opinion' under the applicable regulation because his statements do not reflect any judgment about the nature of Plaintiff's impairments or articulate any limitations on her ability to function.").  And even if, in some cases, a mere diagnosis constitutes a "medical opinion," Plaintiff has not shown (1) how such is the case here, and, more importantly, (2) how the diagnosis of schizoaffective disorder is inconsistent with the *functional* limitations the ALJ provided in his RFC assessment of Plaintiff.

Regarding Dr. Bhrany's GAF scores, the case law also strongly suggests that such scores are not "medical opinions":

> As noted by the [Report and Recommendation], our Circuit holds that an ALJ need not put any stock in a GAF score in the first place, *see Kornecky*, 167 F. App'x 496, 511 (6th Cir. 2006) (Griffin, J.) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Consistent with this rule, our Circuit has held that the failure to reference a Global Assessment Functioning score, standing alone, is not sufficient ground to reverse a disability determination. *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411 (6th Cir. 2006) (Merritt, J., joined by Sutton & Griffin, JJ.) (citation omitted).  Those holdings, while not binding precedent, militate against the notion that a GAF score itself is a medical opinion, as a properly supported medical opinion rendered by a treating physician would be presumptively entitled to deference under SSA regulations.
>
> Moreover, the Commissioner "'has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *DeBoard*, 211 F. App'x at 415 (quoting *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n. 5 (11th Cir. 2005) (quoting 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000))). . . .
>
> Finally, on a related point, a GAF score alone, without a sufficient accompanying interpretative and explanatory narrative, may admit of several different interpretations. For example, because of the way that the GAF score ranges are defined, a particular GAF score alone may

> not constitute a clear statement of medical opinion directed specifically at the relevant capacity of the claimant (such as residual capacity to perform basic work functions). . . . Thus, [the] Magistrate Judge . . . correctly rejected [Plaintiff's] argument that the ALJ committed reversible error by not giving proper consideration to her GAF scores.

*Ackermann-Papp v. Comm'r of Soc. Sec.*, 1:06-CV-832, 2008 WL 314682 (W.D. Mich. Feb. 4, 2008).

In sum, it is not apparent that Dr. Bhrany, who saw Plaintiff on only three occasions, was ever a treating source. She certainly was not a treating source at the time of the April 2009 psychiatric evaluation. Second, even if Dr. Bhrany later established a treating-source relationship, her diagnoses and GAF scores – standing alone – were not "medical opinions." Third, even if they were medical opinions, Plaintiff has not shown how schizoaffective disorder and a GAF of 45 translates into functional limitations beyond the significant mental-impairment limitations the ALJ included in Plaintiff's RFC. Accordingly, Plaintiff has not shown that the ALJ reversibly erred in failing to give Dr. Bhrany's medical records treating-source deference, or in failing to analyze her records under the procedural requirements associated with the treating-source rule.

### 2. The ALJ Did Not Reversibly Err in His Treatment of Dr. Drawl's Opinion or Dr. Balunas' Opinion

Plaintiff argues that the ALJ treated the findings of Dr. Drawl (reviewed by Dr. Varani) inconsistently. (Pl.'s Mot. Summ. J. at 2-3.) Plaintiff says that the ALJ did the same with Dr. Balunas' findings. (*Id.*) The Court considers these claims in turn.

Plaintiff first argues that the ALJ erroneously relied on Dr. Drawl's opinion in finding that Plaintiff had only "mild" restrictions in daily activity because, according to Plaintiff, Dr. Drawl did not diagnose schizoaffective or anxiety disorder (which other physicians did). (*Id.* at 2.) But the

23

diagnosis of a particular disorder is not required for Dr. Drawl to have evaluated the *symptoms* from Plaintiff's disorders. Dr. Drawl focused on Plaintiff's then-present mental impairments and administered testing to that effect. To the extent that Plaintiff argues that the ALJ should not have relied heavily on Dr. Drawl's opinion because it was outdated, it is apparent that the ALJ did not rely solely on Dr. Drawl's findings to conclude that Plaintiff had a "mild" restriction in activities of daily living. Rather, the ALJ also reasoned that Plaintiff spent time at McDonald's, walked the streets, said he enjoyed playing basketball, and that, Dr. Donald Robinson (albeit, a physician who did not treat Plaintiff for his mental impairments) indicated that Plaintiff did not have a medical need for assistance with his activities of daily living. (Tr. 25.) Accordingly, the Court does not find reversible error in this regard.

Next, Plaintiff argues that the ALJ rejected Dr. Drawl's diagnosis of borderline intellectual functioning "without citing any valid medical source to support his finding (that it was not a severe impairment)." (Pl.'s Mot. Summ. J. at 2.) The ALJ acknowledged Dr. Drawl's borderline intellectual functioning diagnosis but then reasoned that other medical professionals, including Dr. Ballard, did not confirm this diagnosis but instead provided that the diagnosis should be "ruled out." (Tr. 23; *see also* Tr. 410.) The ALJ also pointed to the fact that Dr. Drawl's memory test indicated that Plaintiff may have simulated cognitive defects. (Tr. 23.) While substantial evidence might support a severe impairment of borderline intellectual functioning, in view of these two facts, Plaintiff has not shown that substantial evidence does not support the contrary conclusion.

Moreover, even if the ALJ erred at step two by not finding Plaintiff's borderline intellectual functioning a severe impairment, it is not apparent that the ALJ failed to consider the symptoms from this impairment in subsequent steps of the disability analysis nor is it plain how Plaintiff's

24

symptoms from this impairment are beyond the ALJ's rather extensive mental limitations in the RFC assessment.  *Cf. Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006) (providing that failure to find impairment severe is harmless where ALJ accounts for impairment at subsequent steps of the disability process).

Accordingly, even in view of Dr. Drawl's borderline intellectual functioning diagnosis, the Court finds that the ALJ did not reversibly err in concluding that borderline intellectual functioning was not a severe impairment.

Plaintiff similarly claims that the ALJ erred in giving significant weight to Dr. Balunas' opinion but then rejecting his finding that Plaintiff had a moderate impairment in his ability to respond to changes in the work setting.  (Pl.'s Mot. Summ. J. at 3.)  Again, the Court finds no reversible error in this regard.

After reviewing Plaintiff's medical file, Dr. Balunas concluded that Plaintiff was "able to perform work-related tasks involving 1 and 2 step instructions with limited need for sustained concentration and only occasional, minor changes in the work setting." (Tr. 265.)  The ALJ explained,

> I am aware that Dr. Balunas continued on to find that the claimant's impairments also limited him to performing work involving occasional and minor changes in the work setting (Ex. 4F).  I have not included this particular restriction in the residual functional capacity in this case.  As chronicled above, the claimant informed Dr. Varani [Dr. Drawl] that he spends part of his typical day seeing where he is going to stay the next night (Ex. 1F). This is generally consistent with the claimant's report that he stays "here and there" (Ex. l8F).  I recognize that the claimant's living situation invariably includes constant changes in his setting.  Similarly, the claimant's current daily activity of walking around and picking up cans also includes a component of constant change (Hearing Testimony).  As such, I have not adopted Dr. Balunas's final restriction in this case.

(Tr. 34.)

While other inferences may be drawn from Plaintiff's activities of daily living, including those advocated by Plaintiff, the question again is whether the ALJ's inferences were unreasonable. This Court cannot conclude that they were. Plaintiff's ability to adapt to numerous living arrangements could reasonably suggest that he could handle more than "minor" changes in work setting. Moreover, this is not a case, as Plaintiff suggests, where the ALJ cherry-picked those portions of Dr. Balunas' opinion that supported his disability determination. In evaluating Plaintiff's "B" criteria at step three, the ALJ rejected Dr. Balanus' conclusion that Plaintiff had only "mild" limitations in social functioning and instead found that other medical evidence supported a more severe "moderate" limitation. (Tr. 25.) Finally, Dr. Balanus was not a treating source or even an examining source; the ALJ did not owe any heightened deference to Dr. Balanus' findings and therefore reasonably evaluated his limitations on par with other evidence in the record.

In short, the Court does not find reversible error in the ALJ's treatment of the opinions of Drs. Drawl and Balunas.

### 3. The ALJ Did Not Reversibly Err in Evaluating Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in discounting his credibility. (Pl.'s Mot. Summ. J. at 5.) Plaintiff argues that the fact that he did not show for four appointments in a four-month period demonstrates that "he has a poor memory and needs assistance with his medications and the scheduling of appointments." (*Id.*) Plaintiff may be correct that this supports a finding that his testimony about his symptoms was credible. But, once again, the question is whether the ALJ had good reasons for reaching the opposite conclusion. He did.

The ALJ reasonably concluded that, while Plaintiff had mental impairments, nothing in the

medical record suggested that he was so limited as be unable to raise his right hand for the hearing-

testimony oath after repeated requests (Tr. 28).  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476

(6th Cir. 2003) (providing that a court is to accord an "ALJ's determinations of credibility great

weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of

observing a witness's demeanor while testifying").  The ALJ also reasonably pointed out that Dr.

Drawl noted mild symptom exaggeration, and that a test that Dr. Drawl administered indicated that

Plaintiff simulated impairment.  (Tr. 29, 31, 256-57.)  The ALJ also pointed out that Plaintiff (in a

self-completed function report) provided that he could only walk 20 feet without stopping for two

to five minutes, but elsewhere reported walking the streets "all day - every day" and that he walked

halfway to a consultative exam.  (Tr. 28, 260, 214, 442.)  The ALJ further noted that Plaintiff told

Dr. Drawl that he did not have any criminal record, yet testified that he had been in jail several

times.  (Tr. 29 n.1, 94, 254.)  All of these reasons are supported by the record and each provides

support for discounting Plaintiff's credibility.  Further, the ALJ's credibility determinations were

based in part on his observations of Plaintiff at the administrative hearing.

      In short, substantial evidence supports the ALJ's credibility determination.

### 4. The ALJ Did Not Reversibly Err in Failing to Analyze a State ALJ's Opinion

      Plaintiff argues that the ALJ erred by failing to explain why the opinion regarding state

disability by a Michigan ALJ was not the "better-reasoned" decision.  (Pl.'s Mot. Summ. J. at 5.)

The ALJ acknowledged the Michigan ALJ's decision.  In fact, he provided that the opinion had been

"considered" but was "not binding" on him.  (Tr. 29.)  Plaintiff cites no case law in support of the

proposition that the ALJ was required to do more.  And, in fact, there is case law to the contrary:

> Finally, Plaintiff objects to the Magistrate Judge's failure to consider
> the disability finding by the State of Michigan ALJ.  Plaintiff was

27

> found to be disabled by the State of Michigan on December 8, 2005, and entitled to State Disability Assistance ("SDA"). Plaintiff argues that it was error to not consider this finding because the "SDA applies the same operative definition for 'disabled' as used for SSI under Title XVI of the Social Security Act." Plaintiff's objection is without merit. The Regulations clearly state that "[a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind." 20 C.F.R. § 416.904; *see also Noble v. Sec'y of Health and Human Servs.*, No. 88-1433, 1989 WL 25784, at *1 (6th Cir.1989) ("Plaintiff Noble is in error in concluding that the findings of the state agency were in any way binding upon the Secretary."). Accordingly, *the ALJ and Magistrate Judge were not required to consider the conclusion by the state agency that Plaintiff was disabled*, and the court will overrule this objection.

*Elias v. Comm'r of Soc. Sec.*, No. 08-14583, 2009 WL 5166200, at *7 (E.D. Mich. Dec. 18, 2009) (emphasis added, some internal citations omitted). The Court therefore finds no reversible error in the ALJ's treatment of the Michigan ALJ's opinion.

### 5. *The ALJ Did Not Err By Not Specifically Discussing Plaintiff's Obesity*

Finally, Plaintiff argues that the ALJ erred by failing to consider Plaintiff's obesity. (Pl.'s Mot. Summ. J. at 6.) Plaintiff cites Dr. Robinson's evaluation, which indicates that Plaintiff was 5'9" tall and weighed 230 pounds. (*Id.* (citing Tr. 445).) But Plaintiff has not pointed to a single medical record connecting his obesity to a particular functional limitation. (*See id.*) It is not the Court's role to speculate that Plaintiff's obesity would have resulted in greater functional limitations than those already considered and addressed by the ALJ. *See Smith v. Astrue*, 639 F. Supp. 2d 836, 846 (W.D. Mich. 2009) (declining to remand under social security ruling providing procedure for assessing the impact of a claimant's obesity where plaintiff did not carry her "burden of marshaling competent medical opinion and evidence to show specifically how her obesity exacerbated her other impairments, or interacted with them, to render her incapable of all suitable work."); *cf. Essary v.*

*Comm'r of Soc. Sec.*, 114 F. App'x 662 (6th Cir. 2004); *Cranfield v. Comm'r of Soc. Sec.*, 79 F. App'x 852 (6th Cir. 2003). Plaintiff has not shown that the ALJ committed reversible error in failing to separately analyze Plaintiff's obesity.

### G. Conclusion

For the foregoing reasons, this Court finds that substantial evidence supports the Administrative Law Judge's conclusions and that the ALJ did not commit reversible legal error. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

29

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 15, 2012




CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 15, 2012.


s/Jane Johnson
Deputy Clerk